McNABB *et al.* v. HUNT *et al.*

No. 632.   Opinion Filed January 10, 1911.

**PRINCIPAL AND AGENT**—Authority of Agent—Collections—Evidence
—Question for Jury.   Where, to a suit by M. and wife, the mort-
gagors, against H. and S., the mortgagee, for an accounting and
to have applied in payment of the mortgage debt certain moneys
collected and retained by H. as agent for S. derived from sales of
part of the mortgaged property, H. defaulted and S. denied the
agency and by cross-petition sued to foreclose; —held, after ex-
amination, that plaintiff's evidence was sufficient to take the
issue of agency to the jury.

(Syllabus by the court.)

*Error from District Court, Oklahoma County; Geo. W. Clark,
Judge.*

Action by Charles A. McNabb and Callie L. McNabb, his
wife, against John W. Hunt and D. F. Sawyer. Judgment for
defendant Sawyer, and plaintiffs bring error. Reversed and
remanded.

*William L. McCann,* for plaintiffs in error.
*C. W. Stringer,* for defendants in error.

TURNER, J.   To a suit by Charles A. McNabb and Callie
L. McNabb, his wife, plaintiffs in error, against John W. Hunt
and D. F. Sawyer, defendants in error, in the district court of
Oklahoma county for an accounting of all the moneys, proceeds of
sales of part of certain mortgaged property, collected and retained
by said Hunt as agent for said Sawyer, and to have the same ap-
plied, as agreed, in payment of the debt secured by mortgage
thereon, made, executed, and delivered by them to Hunt, and by
him on the same date transferred to said Sawyer, who furnished
the money thereby secured—after default against Hunt, who had
absconded, Sawyer, for answer, in effect, denied that Hunt was
acting as his agent in the premises and in receiving the money
sought to be accounted for, and filed his cross-petition to fore-

close said mortgage. After issue joined, there was trial to a jury, which resulted in judgment for Sawyer pursuant to the prayer of his cross-petition, and plaintiffs bring the case here. At the close of plaintiff's testimony, Sawyer demurred to the evidence, which was sustained on the ground that the same was insufficient to take the case to the jury on the issue of agency; that is, on the issue of whether or not Hunt was acting as the agent of Sawyer in collecting, retaining, and failing to apply, as agreed, the moneys in question. This is assigned for error.

On this point the testimony discloses that on March 20, 1902, plaintiffs in error were the owners of a homestead of 160 acres of land in Oklahoma county; that on said day they borrowed of said Hunt, as attorney and loan broker in Oklahoma City, $4,000, executing their note therefor, due 5 years after date with 7% interest per annum, payable to him at his office in said city, and secured the same by mortgage on said land; that he on the same day assigned the same by written transfer to Sawyer, who resided in Iowa, the same being recorded in said county after this suit was brought; that on September 20, 1902, $140 interest for the first six months was paid by the McNabbs to Hunt when due, they knowing by that time he was acting as agent for Sawyer, who at no time notified them to pay any other person; that about December, 1902, Sawyer for the first time met McNabb in Hunt's office in Oklahoma City, where Sawyer and wife were visiting Hunt's family, and a day or two later the Sawyers and Hunts visited the McNabbs on the land in question; that while there Sawyer said to McNabb he had been informed by Hunt that probably McNabb would want to increase the amount of the loan, whereupon McNabb replied, in substance, that he had talked with Hunt concerning the matter, but had decided not to do so but to sell off a part or all of the place, if necessary to clear up the indebtedness; that, to the inquiry from Sawyer whether he had any offers on the place, McNabb answered that he had been offered $9,000, whereupon Sawyer replied:

"Whenever you want to give this place away for $9,000, you

just tell John (referring to Hunt), and John will give you the money for me."

. Concerning this conversation, McNabb further testified:

"During the time we were talking of selling a portion or all of the place, he asked me which I preferred to do, or which I thought I would do with reference to the sale, and I told him I did not care to dispose of all the place, if I could help it; I thought it would enhance in value, and that I would probably sell a portion of it. He then said: 'Whenever you get ready to dispose of the place, or any part of it, just make your arrangements with John (referring to Hunt, who was present), and everything will be the same as if you were transacting the business with me directly.' "

—That, relying thereon, the McNabbs and Hunt on March 16, 1903, entered into a contract in writing wherein it was recited that, whereas the McNabbs had that day deeded to Hunt a portion of the mortgaged land (80 acres, describing it), it was agreed that Hunt have the same platted in five-acre lots within a reasonable time, and sold to the best advantage, and the proceeds derived from said sale be applied (1) in payment of the expense of said platting and sale, (2) in payment of a $500 note signed by the McNabbs, and (3) in payment of said mortgage debt, the balance, if any, to be turned over to the McNabbs; that, pursuant to said agreement, said land was so platted and lots sold by Hunt to the amount of $4,895.33, which, less expense of $1,715.76, left net proceeds in his hands $3,179.58. Thus matters stood about November 1, 1903, a short time prior to which Sawyer again appeared in Oklahoma City and visited at Hunt's home. There McNabb saw and asked him if he could not set an hour when the three might get together in Hunt's office and go over their affairs and ascertain how McNabb stood with reference to the indebtedness in question and the number of lots that had been sold and what had been realized on them. To this Sawyer said he would be glad to meet the other two and go over the matter. He said, "John tells me you have sold several of the lots." McNabb said: "Yes, several sold, but very little actual money realized. There is quite a number of notes falling due right along

and will be some months before we realize on them." At that time Sawyer set the hour of meeting at ten o'clock that morning in Hunt's office, at which time the McNabbs were there; that after waiting some time Sawyer came, but soon left, saying he had other business to look after, and deferred the matter indefinitely and walked out and left the city that same day. In reply to a letter concerning the matter, Sawyer wrote:

"Iowa City, April 16th, 1904.

"Mr. C. A. McNabb,
    "St. Louis, Mo.

"Dear Sir:

"Your favor of the 15th inst. received. Replying to your inquiry as to how much has been paid on your note of $4,000 held, etc. The interest has been paid, but nothing on the notes. I have just had this matter up with Mr. Hunt, having learned in a roundabout way that a considerable amount of the 160 acres had been sold and nothing paid to me. I wrote to him, 'Hunt,' for a full detailed accounting of the matter. In reply, Mr. Hunt informs me that 35 acres have been sold—also $2,000 of the money received from the sale is unpaid—will be due October next. I knew nothing of this, and am very much surprised that you don't know all about this whole deal, as it is certainly important to you. I also notified Mr. Hunt that no more sales could be made unless the money from the sale were endorsed on 'your' notes. I also said to Mr. Hunt that I would accept my money 'at any time I wrote.' In reply, Mr. Hunt wrote me that as your mother was very sick he didn't care to take the matter up on that account, so it was decided to let the matter rest for the present—but why do you not know that nothing has ever been paid on your notes? Did you think there had?

"Yours truly,.
"D. F. SAWYER."

The assignment of the paper in question was made by Hunt to Sawyer without recourse and was recovered after Hunt had gone not to return, on which day some 20 other assignments evidencing loans secured by notes and mortgages made by Hunt to Sawyer went to record in that county. As to the course of dealing between Hunt and Sawyer, the record discloses that Hunt collected interest and principal on said loans for Sawyer, for which

the borrowers were credited on final settlement with Sawyer; that on a loan thus made to one Brissey the arrangement for paying the mortgage debt by sale of the property was similar to the one in question, which arrangement was known to and approved by Sawyer, and payment was made to Hunt under his direction and the mortgage released by him when thus paid. With reference to a loan to one Griffith in 1902, the testimony discloses that Hunt told Griffith in the presence of Sawyer that Sawyer was the man whom he was getting a loan of $5,000 from; that Sawyer approved the security, directed Hunt to make the loan, which was done, and the mortgage taken thereon in the name of Hunt, to whom interest was afterwards paid, for which Griffith got credit.

The witness Chinn testified that in 1902 he made a loan of $1,500, gave a note and mortgage to Hunt, and met Sawyer in Hunt's office at the time of the transaction; that he had a conversation with him about a year later concerning the loan; that he made interest payments to Hunt and received credits therefor; that later he had a settlement with Sawyer's lawyer; that Sawyer spoke of Hunt having beaten him out of a lot of money, and that witness exhibited receipts or coupon interest notes for payments made to Hunt for Sawyer, and was also credited therefor on the mortgage debt.

While it is a general rule that one paying to an agent the amount due upon written securities when the agent does not have the paper in his possession does so at his peril (*Haines v. Pohlmann*, 25 N. J. Eq. 179; *Smith v. Kidd*, 68 N. Y. 130; *Williams v. Walker*, 2 Sandf. Ch. 325; Jones on Mortgages, sec. 961), and it has often been held that authority to an agent to receive the interest on such security does not authorize one to pay him the principal (Jones on Mortgages, sec. 964; *Fisher v. Schuller*, 50 Iowa, 459; *Draper v. Rice*, 56 Iowa, 114), the general rule and exception thereto is thus stated by Mr. Justice Dillon in *Tappan v. Morseman*, 18 Iowa, 500:

"So that it may be laid down as a general rule that, if a debtor owing money on a written security pays to or settles with

another as an agent, it is his duty, at his peril, to see that the person thus paid or settled with is in possession of the security. If not thus in possession, the debtor must show that the person to whom he pays or with whom he settles has special authority, or has been represented by the creditor to have such authority, although for some reason not in possession of the security."

—*Spence, Resp. v. Pieper & Wife, App.*, 107 Wis. 453; Mechem on Agency, sec. 373.

Applying this rule and exception to the facts herein, the question is, Did Sawyer, in the scheme of the platting and sale of the lots, hold Hunt out to the McNabbs as his agent, and were the McNabbs deceived by appearances thus brought about and induced to part with the moneys derived from the sale of the lots to Hunt by reason of any act of Sawyer? If so, it might be fairly inferred that Hunt was acting as the agent of Sawyer, who is chargeable with the amount of his peculation and must account therefor; otherwise, not. Or if from the facts, which are undisputed, reasonable men might draw different conclusions, the question is one for the jury and the court erred in taking it from them. The testimony is undisputed that about December, 1902, while on a visit to Hunt's home, where he met the McNabbs, Sawyer was informed of McNabb's desire to liquidate the debt by selling off a part or all of the place. As to selling it all, Sawyer, in effect, offered to give therefor through Hunt $9,000, and to the suggestion of McNabb to sell a portion of it, he replied: "Whenever you get ready to dispose of the place, or any part of it, just make your arrangements with John (referring to Hunt, who was present), and everything will be the same as if you were transacting business with me directly." A fair inference from all of which might be that thereby leave was granted by Sawyer to McNabb to make such disposition of the place, looking to the payment of the mortgage debt, as would be approved by Hunt, who would act in his place and stead with reference to the matter. The undisputed testimony further shows that McNabb, relying on the leave or ostensible authority thus given, deeded 80 acres of the mortgaged property to Hunt in trust to carry out the written contract between

them of that date, to the effect that the net proceeds arising from the sale were to be applied by Hunt in payment of the mortgage debt. That Sawyer felt bound by this arrangement is evidenced by the fact that, prior to the statement of account November 1, 1903, at which time McNabb first learned of how matters stood between him and Hunt with reference to the sale of the property, Sawyer, at Hunt's house, at the request of McNabb, set the hour of meeting at Hunt's office to review Hunt's action in the premises and ascertain how matters stood. Upon second thought, however, after appearing there at the hour set, he evaded the appointment and later wrote the letter of April 16, 1904, in effect, denying all knowledge of or interest or participation in the transaction. Without further discussion, we are of the opinion that the court erred in sustaining a demurrer to plaintiff's evidence, and for that reason this cause is reversed and remanded for a new trial.

All the Justices concur.